And the next case we have for argument is Ferrari v. Lynch, Mr. Korzynski. Peter Korzynski for the petitioner. Petitioner's asylum appeal primarily concerns two things. First, an unreliable credible fear interview or CFI summary. And second, unreasonable demands for corroborating evidence by the board. With respect to those, petitioner makes three independent claims warranting reversal and remand. First, the board issued an unreasoned opinion by relying on the unreliable CFI summary. Second, even assuming for the sake of argument the board's adverse credibility finding was based on substantial evidence, the board made unreasonable demands for corroborating evidence. And third, with the CFI summary given proper weight, the evidence compels finding petitioner credible. With respect to the unreasoned opinion argument, the board found petitioner non-credible based on purported inconsistencies from the CFI summary. The board concluded in reviewing that summary that, quote, there were no indications, end quote, that it was unreliable. Yet to the contrary, there are numerous and obvious indications of unreliability. Just as one example, the asylum officer asked petitioner, quote, what the weather was like, end quote. And the reported answer was, quote, we were at the house, and he knocked at the door, and he was furious, end quote. There was no follow-up, no explanation as to what that exchange was supposed to cover. The board's conclusory statement that there were no such indications of unreliability makes it evident that it was not reviewing the evidence before it. Under cases like Mohaddin and Jarossi, petitioner was entitled to a reasoned analysis of the probative evidence in the record. And the court here cannot be assured that that sort of analysis took place. Now, looking here at Moab, a reasoned analysis would show all of the pertinent markers of unreliability are present. First, we're dealing with a summary, which is inherently unreliable. We understand that under the circumstances, it was essentially an interpreted teleconference. Both the asylum officer and the interpreter were over the phone. However, the board in IJ's analysis seems to treat the CFI summary like a verbatim transcript. Tell me again, what is the CSI, I want to make sure what that's called. This is what the, something about fear. Tell me what that, what they call that interview. It's the credible fear interview. Credible fear. Yes. Okay, the credible fear interview. And this is, does this get into a translation problem? Yeah, it's evident from the summary here that there was some sort of interpretive or translation problem where what we have is, are essentially the asylum officer's notes. So then he was taking notes through the interpreter. And it's laid out as a Q&A, but that can be misleading to suggest that this is a verbatim transcript. When, in fact, all we get highlighted are whatever notes that the asylum officer ended up taking. And there are clear lapses in it. At one point, the asylum officer asks about where Petitioner was living, which, in an exchange, in one exchange. And the asylum officer, in her response, just left, in parentheses, a question mark without venturing any follow-up. And this is all about texts from her, is it husband or ex-husband? It's her ex-husband, Ramon Holguin. Okay, he's the threat. Correct. He's the fear of a person for asylum. Correct. And so is there a social group they're trying to claim here? There is. In the initial briefing, at the IJ level, the social group is drawn as the gender, Dominican women, and then the more particular social group of Dominican women who are in a relationship, they cannot leave. Okay, well, this is not really a governmental thing, is it? I mean, if you're asking for asylum, it's asylum from the threat of, I guess now, an ex-husband who is violent. Right. With respect to that issue, I think what's before the court today is, in the first instance, the credibility finding, which is separate from the analysis. There was no analysis with respect to the social group at the IJ or board level. The IJ finding was purely as to whether Ms. Jimenez, the petitioner's account, was credible. But in any event, the social group is drawn in light of a long line of precedent that recognizes that certain cultural norms can give rise to groups that are persecuted. So that's just the way it is in where she's from? Correct, yes. Dominican Republic. Correct. All the guys, a lot of them do this. Well, I wouldn't... I don't want to be too... It's a question about the country. I don't want to be flippant about it, but there's a cultural thing where some, it's okay to beat up on your wife or spouse or something. It's a pervasive problem in which the authorities do not take seriously these incidents. And the record reflects here that Mr. Holguin beat and raped the petitioner on Christmas Eve in 2007 and was released out of custody shortly thereafter, notwithstanding corroborating evidence that was submitted, including a medical report evidencing that Ms. Jimenez was in fact raped, a forensic psychologist report, a police report and an arrest warrant were issued. But soon after, he's showing up at her workplace and threatening her and terrorizing her. The credibility issue was before or after the Christmas party, isn't that something? Right, there was... One of the purported inconsistencies that was highlighted by the board was a timing issue over whether the Christmas Eve incident happened before or after a family party that Ms. Jimenez had attended. This is family of the father of the children, not his. And the father of the children was living in the United States throughout all of this occurring. Now the purported discrepancy on the timing in context in the record is ultimately a trivial one, though we don't concede that it is in fact an inconsistency based on the police report alone. But it's a piece of chronology and the fact is she has corroborated with a police report, a doctor's report, and a psychologist report that she was beat and raped around Christmas Eve. So the court here can reverse and remand without, however, having to make any finding onto extra credibility. The initial argument is the board issued an unreasoned opinion because they simply wrote off or ignored the obvious flaws in the summary. Obvious flaws, inaccuracies. It was not accurate, the summary you said? The summary could not be relied on as the board and I.J. used it as a verbatim transcript essentially. The summary of the interview. The summary of the interview, correct. So I'll reserve the rest of my time. May it please the court, Your Honor, Matthew Connelly for the Attorney General. Your Honor, the board and the immigration judge properly denied the petitioner's applications for asylum and withholding because she failed to support those applications with credible testimony and when having testified incredibly she failed to provide sufficient corroborating evidence to support her applications. As the board emphasized in its report, it relied on three specific instances of inconsistent testimony to support or to affirm the immigration judge's adverse credibility finding. The first is dealing with the incident on December 24, 2007. The petitioner in her credible fear interview indicated that she was taking her son Khalil to a party at the family of his father who is not the person she fears. Is she married to him? She was married to Mr. Marti and then she divorced him. I'm talking about the father of the children. Pardon me, the father of the children is Mr. Marti. Mr. Holquin is her, what she referred to as her common law husband. You guys are beating up on her. He's the attacker in this situation, Your Honor. And she said that as she was going out to take Khalil to the party he stopped her and started to hit her. Two days later she reported the attack to the police. When she reported the attack she said, as I prepared to leave my house and take my son to visit the family of his father, a sentence later Mr. Ramon Holquin proceeded to block my exit. So clearly in the report to the police and in the credible fear interview she indicated that the incident occurred before she left the house. However, when she was testifying in immigration court she said he did not block me or anything. He told me not to go. The violence happened after I came back from the party. So that was an inconsistent statement. What's inconsistent about that? He confronted her when she was leaving but didn't beat her up. And then when she got back he beat her up and raped her. Now the original testimony was that he beat her, and especially it's more detailed in the police report, that he beat her up and raped her before when she attempted to go to the party. Thus she never made it to the party. Actually, what difference does it make whether it was before or after? I'm sorry, Your Honor? What difference does it make whether the beating, attack, or rape took place before or after that particular event? Well, this is an inconsistent statement, Your Honor, and it doesn't have to be. Well, I understand that, but the basic thing is whether or not she was beaten and raped. That is, the question is whether or not she's a credible witness, and there are also other inconsistencies that indicate that she's not. Is there a real doubt that she was raped? I have the medical report here. The medical report indicates that she had lesions on her ear. She had been raped. It indicated that she had lesions that occurred within 20 to 30 days of the examination, which occurred on the 26th of December. That begs the question, sir. I ask you, do you find anything else in that record other than the fact that she was raped, according to the medical report? There is nothing else in the record that indicates that she was not raped at some point. There you go. Okay. That was simply the first inconsistency that the Board noted. The second inconsistency that the Board noted was during the credible fear interview. The interviewer was inquiring about another instance when Mr. Holkman found the petitioner after she had moved out of the house. At that time she made the statement that Mr. Holkman did not hit her. He took my child and, quote, and hit them. And then at that point Mr. Holkman threatened to kidnap and kill her child if she did not come back to live with him. The interview went on as to the asked what child he threatened. It was Khalil, the son. The interviewer asked what did Khalil do. The answer was he didn't do anything. At this point he is the one who hit Khalil. There is no confusion at that point that the petitioner is referring to Mr. Holkman as being the individual who hit her son, Khalil. How old was Khalil? I'm sorry, Your Honor. How old was the kid? How old was the kid at the time? He was about nine years old, Your Honor. Nevertheless, in her testimony in immigration court, Ms. Jimenez-Ferreira denied that Mr. Holkman ever hit her child. She claimed that it was a misinterpretation and provided no further explanation. And then the final inconsistency that the Board relied upon was the question of when was the last encounter between Ms. Jimenez-Ferreira and Mr. Holkman. In the interview, Ms. Ferreira was asked about the times that she had been forced to have relations with Mr. Holkman. And she was asked how that happened. She described that. And then she was asked the question simply, where did it happen? And her statement was, the last time was in my own home in my bedroom. And she was asked what was the date. And she said January of 2010. She was later asked, did you see Ramon again after that date? She said, I had not seen him. I only heard from him over the phone and when he would send me letters. That discussion is on pages 793 and 794 of the record. In her testimony, Ms. Jimenez-Ferreira described an abduction from the street followed by a rape in the woods and then abandonment there. And she identified that as the last time she saw Holkman. What was the date of that? The date of that, Your Honor, is either April or May of 2009 or April or May of 2010. But the date is not strictly relevant. Mrs. Holkman had said it was 2009. Well, it's relevant because there were two last times. That is the question, Your Honor. There were two last times and two very distinct incidents. And while both are very traumatic, the details are very different. It couldn't be a possibility that it happened twice. She just mislabeled them as being the last times. Your Honor, it is possible, but she volunteered that the last time she was raped was in the apartment. And then when she was in immigration court, she testified that the incident described as the rape in the apartment of January 2010 did not happen and that the last time she saw Mr. Holkman was in the woods. And that discussion was on pages of 184 and 185 of the record. Did the immigration judge or the board put any reliance on the medical report? Did they put any reliance on the medical report? Did they mention it? Did they talk about it? They did not. The police reports were discussed, obviously, because they were the basis for the first inconsistency. Did they actually put reliance on the medical report itself? No, Your Honor. They did not. No, it's not in the board's decision. Do you find that significant? Do I find that significant? No, Your Honor, because the question of whether or not Ms. Jimenez-Ferreira was raped by Mr. Holkman is not sufficient to establish her eligibility for asylum as a woman who is in a relationship she cannot leave. That was the first time you'd ever hit her, according to the transcript, and that is the inconsistencies with the subsequent encounters, the ones that suggest that she cannot escape Mr. Holkman, that are much more important to her case, and because they exist, they call her case into question. Because of these inconsistencies, Ms. Jimenez-Ferreira was required to present corroborating evidence for her claim to establish her eligibility for asylum and withholding or removal. The evidence that she established was reviewed by both the immigration judge and the board, and it was found to be insufficient to establish her claims. It is our position that it was appropriate for the immigration judge to expect corroboration under the circumstances. Contrary to petitioner's position, there was no requirement that he notifier of the corroboration requirement beforehand under this court's precedent. Thank you. Where are you going? Where is she now? I'm sorry? Where is she now? Where is she now? It is my understanding that she is in the Chicago area, and she is not currently detained. Thank you. Thank you, Your Honor. Counsel? How much time? Two minutes. Just a few points in rebuttal here. I would just emphasize that the court need not come to a credibility determination again in order to remand the case based on the flawed review of the credible fear interview summary. And I would note that with respect to the government's recitation of the board's reliance on the series of purported inconsistencies, those are drawn primarily from the CFI summary, which fails at numerous places, including the place which the government quoted where the government gave you the excerpt about the son being hit, and the government was contending that the person who was doing the action, there was indeed Mr. Holguin, the abuser. Well, the full quote was, quote, at that point, he is the one who hit Khalil. He did not hit him. I mean, it's an internal contradiction with no follow-up. And in the passage later on, it's talking about a threat instead of there being abuse, or instead of there being actual violence. So, I mean, that essentially, so the point about the location of the rape, the last rape, whether it was in the woods, that's drawn from the CFI. Whether the son was hit, that's drawn from the CFI. The discrepancy over, the board relies on discrepancy over where Mr. Holguin first found Ms. Jimenez, or when she was found after the Christmas attack, that's drawn from, again, the CFI summary. And then the Christmas Eve timing point, as we've discussed, the timing there is irrelevant. She has corroborated that point, and the government, the board and the IJ made no mention of the doctor's report, while at the same time saying she had not corroborated her claim and required further evidence. So, for those reasons and as briefed, we ask the court to reverse and remand. Thank you. Thank you, Counsel. Indeed, thanks to all sides. I take the case under advisement.